CHIEF JUSTICE HAEDIN
delivered the opinion op the court.
The appellant, G. W. Laird, claiming to be the manufacturer and sole proprietor of a cosmetic preparation known as “Laird’s Bloom of Youth or Liquid Pearl,” brought this suit for an injunction inhibiting the appellees, who were wholesale druggists, from using the trade-mark which, he alleged, had been adopted and used by him for many years for the purpose of having the public distinguish thé article made by him from compounds prepared by others, which, as described in the petition, was “ a peculiar-shaped bottle, and a printed label having on it a female bust lithographed, and these words, ‘ Laird’s Bloom of Youth or Liquid Pearl, for beautifying and preserving the complexion and skin; prepared by George W. Laird, No. 74 Fulton St., New York.’”
The plaintiff alleged, in substance, that his said preparation was useful and valuable to the public, favorably known and extensively used, and very profitable to him. He further alleged, in effect, that the defendants were doing a large business in the city of Louisville, and had an extensive southern and southwestern trade, and that, for the purpose of deceiving the public, and thus obtaining the benefits of the plaintiff’s trade-mark and his reputation for superior compounds, the defendants were preparing and selling a compound the ingredients of which were unknown to him, and putting it in bottles of similar color and shape to those used by the plaintiff, with a printed label thereon having upon it an exact likeness of the female bust and words upon the label used by him, except that the name, number, and street — “Joseph Laird, No. 384 Broadway, N. Y.” — were substituted for “ George W. Laird, *133 No. 74 Fulton St., New York;” and that in so imitating and using the plaintiff’s trade-mark the defendants intended to deceive the public, and were counterfeiting his trade-mark to his great injury, and unless prevented by injunction would do so to his irreparable injury.
The defendants filed an answer rather evading than denying the alleged simulation and appropriation of the plaintiff’s trademark, but placing their defense mainly on the ground that the plaintiff in the matter of his complaint was not entitled to the favor or protection of a court of equity, because his said preparation or compound was not useful or valuable to the public, and if used was very injurious instead of beneficial to the complexion and skin, and was poisonous to the human system. They alleged, moreover, in substance, that by an advertisement attached to and accompanying each bottle of the plaintiff’s preparation, recommending it, he was in connection with the sale of it guilty of an imposition and a fraud upon the public.
The cause having progressed to a trial, the court adjudged in effect that the plaintiff’s cause did not sufficiently commend itself to justify the interference of a court of equity, he being himself engaged in deceiving the public with an article which, to say the least of it, was considered worthless; and the petition being thereupon dismissed, this appeal is prosecuted for a reversal of that judgment.
We can not doubt from the evidence that the design of the bottle and the label used by the appellees were unwarrantably adopted by them to mislead the public by inducing the belief that the compound prepared and sold by them was identical with that of the appellant; and we are of the opinion that the imitation was so nearly exact as to be well calculated to produce that effect. It is true neither the appellant’s proper name nor the designation of his place of business was counterfeited; but from the almost perfect simulation of the bottle and label *134 in other particulars the difference would almost certainly escape observation, and especially among people not' familiar with the Christian name and business location of the appellant. And as it is a general rule, applicable to cases like this, that a variation should be regarded as immaterial which it requires a close inspection to detect, we would certainly adjudge that the appellant was entitled to relief if his case appeared to be in other respects a meritorious one.
This leads us to the inquiry whether the court below was right in concluding, as it seems to have done, that the appellant was himself a humbug, and his so-called “Bloom of Youth or Liquid Pearl” a cheat upon the public. In the deductions which we shall make from the evidence as to the properties and effects of this alleged valuable and useful cosmetic, we would not be understood as admitting that the injunction should have been refused merely because the article and its high-sounding name may have been of the fancy kind which, although without intrinsic worth, is often accepted as much through obsequiousness to prevailing fashion as credulity on the part of the public. Nor do we deem it necessary that we should decide whether relief should or not have been denied to the appellant solely on the ground that his advertisement, to which we have referred, contained false and deceptive representations, although that paper, inconsistently, as we think, with the proof in this case, represents the “Bloom of Youth” as the “ secret of beauty,” and “ an invaluable and wonderful toilet article,” the discovery of a celebrated chemist in France, to whom “ all the courts of Europe at the present age owe all their beauty and loveliness.”
But the most important and essential inquiry presented, and the only one which we need to determine, is, did the preparation compounded and sold by the appellant as a harmless cosmetic contain properties which rendered its use injurious or dangerous?
*135 As to this there is some contrariety of evidence. The appellees charged that it contained carbonate of lead, which, according to the evidence, is poisonous; and the mother and brother of the appellant, the only witnesses for him who professed certainly to know what the ingredients of the compound were, and who refused to disclose them all, admitted that it as formerly made contained some carbonate of lead; but they testified that none .of it prepared since 1867 contained any. Several dealers and others, who proved large sales of the compound, testified negatively to a want of knowledge of any injurious consequences arising from its use, and one chemist proved an analysis of what appeared to be a bottle of it, which was said to have been sent to him by a druggist who was unfriendly with the appellees, and that “ he failed to detect in it any other injurious property than oxide of zinc;” but his testimony discloses no sufficient means of knowing that the compound he analyzed was identical with that of the appellant. On the other side it appears from an analysis by a skillful chemist, who was also a physician, of the contents of a bottle which he himself purchased from a druggist as and purporting to be the preparation of the appellant, that the article so analyzed contained such a proportion of carbonate of lead as in his opinion, which is corroborated by that of another physician, was, if used as a cosmetic, poisonous to the human system, having a tendency to produce paralysis and other diseases. It is true that this testimony does not conclusively prove the compound analyzed to have been prepared and sold by the appellant. But as he represented in his advertisement that the article prepared by him was “ sold by all the principal wholesale and retail druggists in the United States,” we must presume, in the absence of any proof to the contrary, that the article so purchased and analyzed was truly represented to have been prepared by him. If, however, this were not so, and the compound contained oxide of zinc instead of carbonate of *136 lead, as there is some testimony conducing to prove, that too is shown to be poisonous when mixed, as it often is, with lead or arsenic. But whatever may be the ingredients of the “Bloom of Youth” as prepared since 1867, it conclusively appears that as it was then manufactured, and during many years before, it all contained carbonate of lead, and was consequently a poison.
This suit was brought in 1868. How much of the appellant’s dangerous compound prepared in the preceding years then remained on his hands for sale, or was still unsold and upon the market, does not appear; but the inference is authorized that the quantity was large. In addition to all these facts, the utter failure of the appellant to prove the ingredients of this questionable drug of his is a significant and cogent circumstance against him.
We are constrained to conclude that the appellant in putting his compound on the market as he did, with his express as well as implied assurance to the public that it was “free from all mineral and poisonous substances,” deliberately engaged in the perpetration of a fraud, which in a court of equity should be rebuked rather than upheld or protected. To a party thus presenting himself, a court of equity, adhering to the maxim that “he who asks equity must come with pure hands,” will not lend its aid when the object to be effected is to secure him the exclusive privilege of deceiving the public in a particular way, although in doing so it might prevent another equally guilty from committing the same wrong. (Fetridge v. Wells, &c., 13 Howard’s Pr. Rep. 385; Hobbs v. Francais, 19 ibid. 567; Pidding v. How, 8 Simons’s Rep. 477.)
Wherefore the judgment is affirmed.